(No. 28024.—

HAROLD A. ARNOLD *et al.,* Appellees, *vs.* THE CITY OF CHICAGO *et al.,* Appellants.

*Opinion filed September 19, 1944.*

BARNET HODES, Corporation Counsel, (MARTIN H. FOSS, and ROBERT C. FERGUS, of counsel,) all of Chicago, for appellants.

HIRSCH E. SOBLE, of Chicago, for appellees.

Mr. CHIEF JUSTICE FULTON delivered the opinion of the court:

This case involves a direct appeal to this court from a decree of the superior court of Cook county, declaring the Currency Exchange Ordinance of the city of Chicago illegal and void and permanently enjoining the city and its offi-

cials from enforcing such ordinance against the plaintiffs. The trial judge certified that the validity of a municipal ordinance was involved and that the public interest required a direct appeal to this court.

The plaintiffs (appellees,) comprising a considerable number of owners and operators of currency exchanges located in the city of Chicago, filed their complaint on February 17, 1944, on behalf of themselves and any others similarly situated desiring to join therein. It was therein alleged that the business performed by the plaintiffs consisted of cashing checks, money orders and bank drafts issued within the United States; selling and issuing domestic money orders under their own names; paying gas, light, phone and water bills for customers, and procuring Illinois automobile licenses and city vehicle tags for customers for a small fee or service charge; that on July 1, 1943, there was enacted by the State of Illinois a statute regulating community currency exchanges and providing that thereafter no person, firm, association, partnership or corporation should engage in the business of a community "currency exchange" without first securing a license so to do from the Auditor of Public Accounts; that the statute further provided for an investigation fee of $25 and an annual license fee of $50; that upon approval of the application for license by the Auditor of Public Accounts a license was to be issued to permit the operation of a "currency exchange" at the location specified in the application, no more than one place of business to be maintained under the same license, but that more than one license may be issued to the same person. The statute defined a "Community Currency Exchange" to be "any person, firm, association, partnership or corporation, except banks incorporated, under the laws of this State and National banks organized pursuant to the laws of the United States, engaged in the business of and providing facilities for cashing checks, drafts, money orders and all other evidences

of money acceptable to such community currency exchange for a fee or service charge, or other consideration, or engaged in the business of selling or issuing money orders under his or their or its name or any other money orders (other than United States Post Office money orders, American Express money orders, Postal Telegraph money orders, or Western Union money orders), or engaged in both such business." Ill. Rev. Stat. 1943, chap. 16½, par. 31.

Section 27 of the act provides: "Nothing contained in this Act shall be construed so as to limit the power of municipalities, to license and tax community currency exchanges, and to regulate their location and operation in a manner not inconsistent with this Act."

After alleging compliance with the terms of the Illinois act the complaint alleged that on December 15, 1943, the city council of the city of Chicago adopted its Currency Exchange Ordinance which defined a currency exchange as contained in the State act, but provided that no person shall engage in the business of or conduct a currency exchange without first having obtained a license so to do at the annual license fee of $75, providing therein further that where more than one location was to be operated, a separate license was required for each such location and that any holder of a license, shall have the privilege of engaging in or conducting the business from armored trucks or vehicles upon the payment of an additional license fee of $100 for each such truck or vehicle.

Plaintiffs below further charged that the said ordinance is invalid as to the plaintiffs because the power to regulate, license or tax the currency exchange business was never granted to the city council of Chicago and that therefore the council was without legal power or authority to pass the ordinance; that the ordinance contravened the Illinois Currency Exchange Act and that section 27 of the State act, in providing that nothing contained in the act was to be construed so as to limit the power of municipalities to license

and tax currency exchanges, is illegal and void, is repugnant to the State act and referred to a power which municipalities do not have; that under the terms of the State act it was not permissible to operate currency exchanges from armored trucks; that the license fee provided by the city ordinance was unreasonable, oppressive and excessive and that the additional fee for each truck is unreasonably discriminatory in favor of those who use trucks as against those with fixed locations.

The prayer of the complaint asked for a temporary and permanent injunction; that the ordinance be declared illegal and void; that, in the alternative, if complete injunctive relief should not be granted, the portion of the ordinance granting the privilege of engaging in the business from currency exchange vehicles be declared illegal and void and the city restrained from collecting fees therefor. To this complaint the defendants filed motions to strike and dismiss.

The matter was referred to a master in chancery who filed a report recommending the issuance of a temporary injunction, overruling the defendants' motion to dismiss and declaring that the city was without power to pass the Currency Exchange Ordinance, holding in favor of the defendants on all other issues.

The superior court approved the report of the master and held that the city was without power to enact the ordinance and that section 27 of the State act was what is generally termed a "saving clause" and does not amend the Cities and Villages Act by delegating to the cities the power to tax, license and regulate currency exchanges.

The defendants having elected to stand upon their motions, the trial court entered a final decree denying the motions of the defendants and permanently enjoining the city from enforcing the ordinance, declaring same to be illegal and void.

It is here contended by the appellants that the city possesses the power to enact the ordinance in question by

virtue of section 91 of article 23 of the Revised Cities and Villages Act, (Ill. Rev. Stat. 1943, chap. 24, p. 410,) which gives the city the power "To license, tax, and regulate * * * money changers, bankers, brokers," and that the State Currency Exchange Act did not withdraw from the city such granted powers; that the provisions of the ordinance pertaining to currency exchange vehicles do not contravene the State act and that the provisions of the ordinance are not unlawfully discriminatory.

Appellees file cross errors charging that it was error on the part of the trial court in not holding that the State act does not permit the conduct or operation of currency exchanges from armored trucks or other vehicles; that the license fee exacted by the ordinance is unreasonable, excessive and oppressive and that the ordinance is unreasonably discriminatory in favor of those conducting currency exchanges from armored trucks or vehicles.

In determining the merits of this controversy, it is desirable to make a review of the sources pertaining to a municipality's power to license, tax or regulate an occupation. We have heretofore stated the general rules here applicable in City of Bloomington v. Wirrick, 381 Ill. 347, at page 352, where it was said: "It has long been the established rule in Illinois that municipalities may only exercise the powers delegated to them by the General Assembly. All legislative power is vested in the General Assembly by the constitution. That body may exercise the power directly or it may create municipalities and delegate to them, for the purposes of local government, such portion of the power as it sees fit to grant. Municipal corporations owe their existence to, and their powers are derived solely from, the General Assembly. They have no inherent power. In order to legislate upon, or with reference to, a particular subject, they must be able to point to the statute which gives them the authority to exercise the power which they claim the right to exercise. Statutes granting powers to

municipal corporations are strictly construed. Any fair or reasonable doubt of the existence of the power is resolved against the municipality which claims the right to exercise it. The implied powers which a municipal corporation possesses and can exercise, are only those necessarily incident to the powers expressly granted. Inasmuch as a city has no power, except by delegation from the General Assembly, in order to enable it to impose any tax or license fee, the power must be expressly granted or be necessarily implied in, or incident to, the powers expressly delegated. *People ex rel. Lapice* v. *Wolper,* 350 Ill. 461; *City of Rockford* v. *Nolan,* 316 Ill. 60; *Arms* v. *City of Chicago,* 314 Ill. 316; *Potson* v. *City of Chicago,* 304 Ill. 222; * * *. Subsection 1 of section 23 of the Revised Cities and Villages Act provides that the city council in cities shall have and may exercise the powers enumerated in subsections 2 to 107, inclusive, of that section. This express eumeration of the powers conferred upon municipalities, is an exclusion of all other powers not expressly delegated to them, and which are not necessarily implied in those expressly delegated." *Potson* v. *City of Chicago,* 304 Ill. 222.

Thus we see that local municipalities derive not only their existence but all their powers from the General Assembly, and, having no inherent power, they must always be able to point to the particular statutory provision giving them authority to legislate on a particular subject.

With these general rules appellants have no quarrel. It remains, therefore, for us first to determine whether the power to pass the ordinance in question has by the legislature been delegated to the city of Chicago. Our attention is called by appellants to section 91 of article 23 of the Revised Cities and Villages Act, which delegates to the city power to license, tax and regulate money changers, bankers, brokers, etc. This section, coupled with the general powers granted in sections 5, 105 and 106 of article 23

of the Revised Cities and Villages Act, appellants contend is the source of the city's powers to enact the ordinance in question. It is urged that the definition of currency exchange contained in both the ordinance and also the State Currency Exchange Act is obviously a definition which includes money changers; that when plaintiffs and other owners of currency exchanges cash checks, money orders and bank drafts and sell and issue domestic money orders, traveler's checks, etc., they do deal in money or exchanges, which is the business conducted by a money changer and that, therefore, since the business of a currency exchange operator includes that of a money changer, the city properly enacted its currency exchange ordinance. Appellants further argue that when construing words denoting businesses or occupations, rather than some static physical thing which remains constant, this court is not required to be insensible to the modern-day methods of conducting the business, or to limit an authority delegated by the legislature in such a way as to render municipalities impotent to cope with ever-changing conditions in the business.

The term "money changers" first appeared in the Cities and Villages Act of 1872 in section 91 of article V thereof. This section was amended by two acts of the Fifty-ninth General Assembly on July 10, 1935, and again was used in section 91 of article 23 of the Revised Cities and Villages Act approved August 15, 1941. As early as 1850 the term was contained in the charter of the city of Belleville. To determine the intent of the legislature in including the term "money changers" in section 91 of article V of the Cities and Villages Act of 1872, the section is to be construed as of the time of the enactment and as it was intended to be understood when the act was passed.

It was said in *Dean Milk Co.* v. *City of Chicago,* 385 Ill. 565, at page 571: "Expediency, born of changing circumstances and conditions, will not alter the meaning of plain and ordinary language used in an ordinance. The

words of an ordinance must be taken in the sense in which they were understood at the time the ordinance was enacted. (*People ex rel. Fyfe* v. *Barnett*, 319 Ill. 403; *United States* v. *Union Pacific Railroad Co.* 91 U. S. 72, 23 L. ed. 224.)"

The function of this court is, then, to interpret the meaning of the legislature and declare the intent of the legislative body in delegating to the city the power to regulate and tax "money changers."

Webster's International Dictionary defines a money changer as "one whose occupation is the exchanging of kinds or denominations of currency." The common meaning of the term pertained to those persons who in early history engaged in the business of foreign exchange. It is pointed out by J. W. Gilbart in Volume 1, The History, Principles and Practice of Banking, Revised 1930, that after bullion was superseded by coin and each nation or peoples had a coin of its own, merchants dealing with these various nations or peoples would, necessarily, in the course of their business or trade, receive coins belonging to different nations and hence would be applied to by strangers who wished to exchange their own money for the money of the country in which they sojourned.

It appears that merchants attending foreign markets brought with them gold in bars and quantities of fine silver, which they exchanged on the spot for the currency or coin of the place where their business was to be transacted. Charges were made for these exchanges and the business of money changing became very lucative. This we deem to be the commonly accepted understanding of the meaning behind the term "money changers."

The case of *Hinckley* v. *City of Belleville*, 43 Ill. 183, chiefly relied upon by appellants, construed the charter power of the city of Belleville to license, tax and regulate bankers and money changers. Here it was said: "A money-changer is defined by Webster to be 'a broker who deals in money or exchanges.' The word has passed out of com-

mon use, but when used, we understand it in the sense given by the learned lexicographer. Thus defined, it is certainly included in the business of a banker, and constitutes, indeed, the greater part of it. So, also, the buying and selling of uncurrent funds, and the exchanging one kind of money for another, are equally the practice of the money-changer and the banker."

Currency exchanges, heretofore being in existence only about twelve years, were unknown at the time of the first legislation in Illinois using the term "money changers." The legislature could not, at the time the original act was passed, have contemplated that the term "money changers" could include currency exchanges as defined in the State Currency Exchange Act because at that time there were no currency exchanges. We cannot agree with the appellants to an interpretation including a "currency exchange" in the term "money changer" taken in the sense that our "money changer" was understood at the time the original statute was enacted.

Currency exchanges have never been known as money changers. When the Revised Cities and Villages Act was enacted by the legislature in 1941, currency exchanges were in common use in this State and had a well-known and popular meaning as pertaining to the business of cashing checks for a small fee or charge. Yet, at the time of the enactment of the Revised Cities and Villages Act the legislature did not specifically include currency exchanges within the city's taxation and regulation powers. Likewise, when the State Currency Exchange Act was enacted there still was a failure on the part of the legislature to amend the Revised Cities and Villages Act to include the power to tax currency exchanges, and nowhere in the Currency Exchange Act is there any reference to money changers. We cannot conceive that under the circumstances the legislature intended the term "money changers" to include currency exchanges as we popularly understood them. Any fair or

reasonable doubt of the existence of that power must be resolved against the municipality seeking to exercise it. (*Potson* v. *City of Chicago*, 304 Ill. 222.) We have carefully examined in this respect the cases cited by the appellants to substantiate their theory, but find that none cited avail them in our view of the controversy.

What the framers of a statute would have done had it been in their minds that a case like the one here under consideration would arise is not to be by us here considered. (*People* v. *Day*, 321 Ill. 552.) As we have heretofore indicated, the inquiry is what, in fact, they did enact, probably without anticipating the existence of such facts. No mere omission or failure on the part of the legislature to amend the Revised Cities and Villages Act to meet changing conditions will justify any judicial addition to the language of the act. Changes can be made by the legislature when it deems such changes necessary or proper in view of changed conditions. *Dean Milk Co.* v. *City of Chicago*, 385 Ill. 565.

Appellants further contend that section 27 of the State Currency Exchange Act is an implied recognition by the legislature of an existing power in the municipalities to tax, license and regulate "currency exchanges" and that said section expressly reserves to a city the right to enact the ordinance in question.

Section 27 is what is generally termed a "saving clause" and cannot be construed as a recognition by the legislature of an existing power which did not actually exist and cannot be construed as an amendment to the Revised Cities and Villages Act. At most, section 27 is an expression by the legislature of an erroneous opinion concerning the existing law, and as was said in *Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149, at page 169: "The usual function of a saving clause is to preserve something from immediate interference—not to create; and the rule is that expression by the legislature of an erroneous opinion concerning the

law does not alter it. Endlich Interpretation of Statutes, sec. 372."

With the view we have taken, it is unnecessary to discuss or pass upon the further points raised by the parties hereto.

For the reasons stated, and giving effect to the principles of statutory construction herein enunciated, the decree of the superior court of Cook county is affirmed.

*Decree affirmed.*