Fritz V. Nordine, et al., Plaintiffs-Appellants, v. Illinois Power Company, a Corporation, City of Bloomington, Illinois, a Municipal Corporation, Bob McGraw, et al., Defendants-Appellees.

Gen. No. 10,533.

Fourth District.

April 17, 1964.

Supplemental opinion, June 8, 1964.

Rehearing denied June 8, 1964.

Robinson, Foreman, Rammelkamp, and Bradney & Hall, all of Jacksonville, and Yoder and Yoder, of Bloomington (Orville N. Foreman, Walter A. Yoder, Theodore C. Rammelkamp and James W. Yoder, of counsel), for appellants.

James R. DePew and Joseph W. DePew, both of Bloomington, for appellees, and Livingston, Barger & Brandt, of Bloomington, and Dallstream, Schiff, Hardin, Waite & Dorschell, all of Chicago (Querin P. Dorschell, Herbert M. Livingston and William T. Hart, of counsel), for appellee, Illinois Power Co., and Tray-

nor and Hendricks of Springfield (John B. Hendricks, of counsel), for Illinois Municipal Utilities Ass'n, amicus curiae.

SMITH, J.

The crux of this case, as raised by the complaint and motion to dismiss, is whether or not a municipality operating a municipal electric utility by authority of an initiating referendum may terminate that activity and sell the entire utility by sale of personal property and real estate under sections 11–76.1 and 11–76.4 of the Municipal Code. The case was originally appealed to the Supreme Court and, by it, transferred to us. Plaintiffs are citizens, taxpayers, and patrons of the utility and filed their suit to avoid the sale of the utility to defendant, Illinois Power Company. Defendants' motion to strike the complaint was allowed, plaintiffs elected to stand on their complaint, and an appropriate judgment in bar of the action was entered by the circuit court of McLean County. Plaintiffs appealed.

In this state of the record, the factual setting for this litigation must be found in the pleadings and the exhibits attached. It appears from Count I that the municipal utility serves about 2,200 people; furnishes street lighting; furnishes electricity for municipal buildings and for water pumping; is in competition with the Illinois Power Company, and operates at an annual profit. Undisputed original authority to operate was grounded on three elections held in 1930, 1940, and 1949. In 1956, specific authority to sell to the defendant company was sought by referendum and defeated at the polls. On August 13, 1962, the power company submitted to the city council an offer to purchase the entire municipal utility conditioning the acceptance thereof and the sale upon an absence of a referendum. On September 20, 1962, the city council

426

accepted the proposal by ordinance and directed the sale of the personal property. On the same day, the city council passed an ordinance directing that the real estate be advertised for bids on October 22, 1962. Count I charges that the city was obliged to continue the operation of the utility until such obligation was withdrawn, revoked, or terminated by an appropriate vote of the electorate or by act of the legislature. The usual allegations for equitable jurisdiction based on irreparable harm and absence of remedy at law are asserted.

Count II charges that, the utility was acquired, owned and operated in trust for the taxpayers, consumers, and electors of the city; the purported sale of the personal property and of the real estate is a sham and a subterfuge and is, in fact, a sale of the entire utility; the finding by the city council that the personal property and the real estate is no longer necessary or useful to the city is unreasonable, arbitrary, and an abuse of discretion in that 2,200 consumers are served; city electrical needs for public buildings, etc. are supplied; such findings are contrary to an ordinance of 1958 authorizing a bond issue and establishing the useful life of the utility at 30 years; the utility is operating at a profit; and the defendants knew, or should have known, the voters desired a referendum, and petitions containing some 4,400 signatures were in circulation.

Count III is a supplemental complaint incorporating by reference Counts I and II, and alleging that the sale was consummated on or about November 1, 1962; a bill of sale was delivered; a deed was delivered; the consideration of $2,500,000 was paid and is now held by the city in a special fund without designation; and that the power company is now operating the utility. It prays that the bill of sale, the deed, and the transfer

be set aside, and the parties and the property be restored to their former status.

The personal property of the utility was sold separately for $2,250,000 plus the payment by the purchaser of the outstanding municipal electric bonds in the aggregate sum of $540,000. Other provisions of this sale are unimportant and need not here be recited. The real estate was sold separately after due advertisement for $250,000. It should be here noted that hereafter the city will pay to the defendant rates comparable with those charged other specified cities in the area for power used in street lighting, pumping and other municipal uses.

Defendants filed their motion to strike the several counts of the complaint as amended and to dismiss the suit for want of equity assigning among other reasons the following: (a) that many allegations are mere conclusions of the pleader, (b) that the city is not obligated to continue its electric utility until such obligation is withdrawn or revoked by referendum or withdrawn by act of the legislature, (c) that the authority to sell is found in sections 11–76.1 and 11–76.4 of the Municipal Code, (d) that an election under the public policy statute of this state would not be binding on the city council and (e) that plaintiffs, as taxpayers, electors and consumers, have no standing to interfere with the discretionary power of the city officials to sell and dispose of the property.

Plaintiffs contend that municipal performance in the electric utility field conceived through referendum can only be terminated and interred by referendum of like dignity, or by specific legislative authority without referendum. In the alternative, if the authority to terminate does exist, the manner of its exercise in the instant case was improper, illegal and fraudulent, as a matter of law. In either event, it is said, the transaction is illegal and void.

428

All parties, including Illinois Municipal Utilities Association as amicus curiae, agree that there is no statute dealing specifically with the discontinuance or sale of a municipal electric utility. All parties agree the City of Bloomington was engaged in a proprietary, rather than a governmental function. The power company contends the sale here consummated finds its vitality and legality in Ill Rev Stats 1961, chap 24, as follows:

"par. 11–76.1. Any city or village incorporated under any general or special law which acquires or holds any real estate for any purpose whatsoever . . . has the power to lease the real estate for any term not exceeding 99 years, and to convey the real estate when in the opinion of the corporate authorities, the real estate is no longer necessary, appropriate, required for the use of, profitable to, or for the best interests of the city or village. This power shall be exercised by an ordinance passed by three-fourths of all the corporate authorities of the city or village, at any regular meeting or at any special meeting called for that purpose. . ."

"par. 11–76.4. Whenever a city or village incorporated under any general or special law, other than a city or village of 500,000 or more population, owns any personal property which in the opinion of three-fourths of all the corporate authorities, is no longer necessary or useful to, or for the best interests of the city or village, such a majority of all the corporate authorities, at any regular meeting or at any special meeting called for that purpose, (1) by ordinance may authorize the sale of that personal property in such manner as they may designate, with or without advertising the sale. . . ."

The Supreme Court has stated that the use of the words "for any purpose whatsoever" in par 11–76.1 is sufficient to express an intention to include lands owned outright whether devoted to public or private uses, but is insufficient to embrace lands held under an express trust created by a settlor. City of Aurora ex rel. Egan v. Y.M.C.A., 9 Ill2d 286, 137 NE2d 347. The property here in question is patently not held under an express trust created by a settlor, and cases in other jurisdictions discussing governmental or proprietary functions in the sale of property are neither persuasive nor controlling. If, therefore, the statutory provisions above cited do not complement each other to authorize the sale of a going electric utility, then there is neither statutory authority nor case law in this state specifically authorizing the sale of a municipal electric utility. If such is the case, it follows that the legislature has provided through referendum for the acquisition and operation of a municipal electric utility, but has made no specific provision for its discontinuance and sale.

To acquire and operate a public utility the legislature has ordained that the enabling ordinance, to be effective, must be approved by the electorate and specifies the manner of its submission. Ill Rev Stats, 1961, chap 24, § 11–117–3. It does not follow that a like procedure must be followed to discontinue and sell. The power to grant or withhold a referendum rests with the legislature. In City of Mt. Olive v. Braje, 366 Ill 132, 135, 7 NE2d 851, 853, the Supreme Court said:

"... The legal voters of any such municipality have no inherent or constitutional right to require the governing body to submit any legislation to a referendum. Such requirements exist only by virtue of statutory provisions which the legislature has the right to impose or withhold.

430

The wisdom of requiring a question to be submitted under certain circumstances, and not under others, is a matter for legislative determination and not for the courts."

The rule thus stated is not weakened by the argument that since commencement by the City is a matter of public policy requiring a referendum as stated in Illinois Power Co. v. City of Jacksonville, 18 Ill2d 618, 165 NE2d 300, discontinuance is, ipso facto, a matter of public policy and likewise requires a referendum. The legislature has specifically required a referendum in the one but not in the other. Whether or not there should be a referendum on discontinuance and sale is properly a legislative rather than a judicial determination. Our legislature has made no specific determination.

Plaintiffs point to several instances in the statutes where the power to carry on municipal functions such as street railways, sanatoria, municipal bands, etc. was conditioned upon an approving referendum and then either in the original act or by subsequent amendment specifically require a further referendum to discontinue the activity. At the time of such enactments there was in full force and effect general statutes authorizing the sale of municipal property in substantially the same language as is now contained in 11–76.1 and 11–76.4. It is, therefore, asserted that this shows a legislative determination that the general sale statute is insufficient to authorize a termination of a municipal enterprise and a sale of the property used in connection therewith, but that specific authority by referendum or otherwise to sell an operating municipal enterprise is required. This assertion is based on the theory that, in ascertaining the intention of the legislature, "it is proper not only to compare statutes relating to the same subject matter, but to consider statutes upon related subjects though not strictly in

pari materia." Anderson v. Park Ridge, City of, 396 Ill 235, p 244, 72 NE2d 210. We think there is merit in this position. Defendants would torpedo this conclusion by saying that the projects above mentioned partake more of governmental rather than proprietary or business functions of the city and therein is the distinction. The torpedo misfires. We have already noted that the Supreme Court makes no such distinction in its interpretation of the power of sale contained in pars 11–76.1 and 11–76.4 between public and private uses. We see no sound basis for any such distinction in the application of the rule above stated for ascertaining legislative intention. It seems clear to us that in every instance within our knowledge, where a municipal function has been commenced by authority of a referendum, the legislature has predicated its termination upon a specific statute authorizing such termination. In the instances cited it has, by specific legislation, authorized the termination by referendum. We do not hold that a referendum is the only method whereby the municipal function can come to an end. We do hold that it can come to an end by specific legislation specifically providing for its demise, either through referendum or other appropriate municipal action. Looking as we have at the legislative history in this state on the termination of municipal functions, we cannot read into 11–76.1 and 11–76.4, a legislative intention to authorize the termination of a referendum-created municipal function by simply selling the real and personal property employed therein. As related to public utility functions, we are of the opinion that these sections are appropriately employed to dispose of parts or parcels of real estate or items of personal property no longer reasonably required in the operation of the utility because of obsolescence, replacement, renovation, relocation of facilities in whole or in part, or new and advanced methods of supplying

432

the service or product. In short, they may properly be used in implementing and furthering the referendum imposed obligation in the city to supply electrical power and service to itself and its patrons. They cannot be used as an avenue of escape from that obligation or used singly or in combination to destroy, embalm and inter that obligation.

■ That municipalities are creatures of the statute and have only those powers which are expressly granted, or necessarily implied in order to carry out the express powers granted is universally recognized. In Arnold v. City of Chicago, 387 Ill 532, at pages 536–7, 56 NE2d 795, the court stated:

> "Municipal corporations owe their existence to and their powers are derived solely from the general assembly. They have no inherent power. In order to legislate upon, or with reference to, a particular subject, they must be able to point to the statute which gives them the authority to exercise the power which they claim the right to exercise. Statutes granting powers to municipal corporations are strictly construed. Any fair or reasonable doubt of the existence of the power is resolved against the municipality which claims the right to exercise it."

We deal here with something more than a sale of real or personal property. We deal here with the sale of a going municipal business enterprise. Sections 11–76.1 and 11–76.4 do not specifically authorize any such sale, nor do we think that such authority can be reasonably implied. Implied powers are judicially recognized in the implementation and furtherance of express powers and not to bring about their termination or destruction. To recognize a union of these two sections to effect a sale of this utility is to judicially imply what the general assembly has not specifically autho-

433

rized. Its historical actions in other areas of municipal enterprises leaves a fair and reasonable doubt that these two sections were ever intended as a grant of power to terminate and sell a going municipal utility. Such doubt must be resolved against the existence of such municipal power, and we so hold.

Our view is strengthened by language in 10 McQuillin, Municipal Corporations (3rd Ed) par 28.38:

> "The better rule seems to be that a city which owns its water-works system cannot, *without special authority,* sell it, and the same is true as to an electric light plant, it being immaterial that water and light are supplied to the inhabitants for domestic purposes, and that rentals and charges are paid therefor." (Emphasis supplied.)

We necessarily hold that the City of Bloomington was and is without legislative authority under secs 11–76.1 and 11–76.4 alone to terminate the obligation imposed upon it by its electorate.

█ Defendants moved to strike allegations in the complaint charging that more than 25% of the electorate desired a vote on the question pursuant to the provision of chap 46, sec 28–1, Ill Rev Stats, that petitions were in circulation and the defendants advised thereof, that such a vote would have been controlling or, in the alternative, a factor to be considered by the city fathers and that their consummation of the sale without such a vote was an arbitrary and unreasonable exercise of municipal discretion and was intended to and did thwart an expression of public opinion on the subject. Defendants' motion to strike these allegations is based on the proposition that such an election, if held, would not be controlling but would be advisory only. This motion is well taken. In City of Litchfield v. Hart, 306 Ill App 621, 29 NE2d 678,

the city had adopted an ordinance providing for a wheel tax. Thereafter, the question of whether the tax should be collected was submitted to the voters of the city and a majority of the votes cast was against the collection of the tax. The city proceeded to collect the tax against Hart. He defended on the grounds that the election and vote abrogated the power of the city to collect the tax. In holding against this contention, the court said at page 624:

"The title to the act which said election was held under is as follows: 'An act providing for an expression of opinion by electors on questions of public policy at any general or special election.' From the language used in the title, it appears that the act provides for the expression of opinion thereon by electors, and allows them an opportunity to express their sentiment on certain questions. This is as far as the act goes. It does not state what the effect of the election shall be, nor is there any provision in this statute where an adverse vote against any question of public policy would nullify all statutes or ordinances in conflict with said vote. The legislature meant just what it stated in the title of the act, that is for the people of a political subdivision to express an opinion upon the question of public policy, the result of which is not binding upon the authorities, but merely advisory. The result of an election under a public policy act, is not mandatory upon the government officials of a political subdivision, but only directory.

"The public policy act is not analogous to the initiative and referendum. Initiative means the power of the people to propose bills and laws, and to enact or reject them at the polls, independent

435

of legislative assembly. Referendum is the right of the people to have submitted for their approval or rejection, an act passed by the legislature."

It seems clear, therefore, that a referendum under chap 46, sec 28–1 would have been directory and not mandatory. We are not concerned with whether an election adverse to the sale of the utility would preclude such a sale as a matter of law or whether an election favorable to such sales would have authorized such a sale not otherwise specifically authorized by statute. Our determination of the sufficiency of this complaint must rest upon what was done by the municipality and not upon what might or could have been done. The right of the electorate to express an opinion upon the public policy of continuing or discontinuing the municipal electric utility has no bearing upon any issue involved in this proceeding. Allegations of the complaint relating to such an election and the effect thereof should be stricken.

■ It is urged in the defendants' brief that this is the first time that the power of a municipality to sell its municipal utility properties has been questioned in our courts; that such sales of municipal utility properties have been consummated in the past; and that this is indicative of the accepted interpretation placed upon the Illinois law relating to such transactions. There is, of course, nothing in this record to substantiate these assertions or to show how or in what manner these transactions were accomplished or the procedure then followed. Suffice it to say that the existence or nonexistence of municipal power is not dependent upon whether the municipal fathers and those who deal with them think it does or does not exist. An unchallenged exercise of an assumed municipal power by one municipality does not give rise to an otherwise nonexistent power in other municipalities.

■ The defendants further contend that the plaintiffs are without standing in a court of equity to maintain this suit. This contention is without merit. Cases are cited dealing with fraud, collusion, special pecuniary damage, irreparable injury or an unconscionable abuse of the exercise of an admitted legislative power and the allegations necessary to sustain such complaints are not in point. We here deal not with an inequitable or improper exercise of a municipal power but with an alleged total absence of such power. If the courts may intervene in proper cases where there is an improper or inequitable exercise of an existing power, it would seem that they may appropriately intervene in an attempted exercise of a nonexistent power. In Dowsett v. City of East Moline, 8 Ill2d 560, 134 NE2d 793, plaintiff sued to enjoin the issuance of a water revenue bond alleging an illegal notice. The ordinance there involved required the city to pay from general funds for water used in fire hydrant and other city purposes. At page 568, the Supreme Court said:

"Here we have the general fund of the city involved because the ordinance binds the city to pay from the general funds of the municipality for water used in the fire hydrants and for other city purposes. . . . We feel, therefore, that a consideration of the issues involving the merits is appropriate."

And as shown here by the pleadings under defendants' contract with the City of Bloomington, the city is required to pay for street lighting and public buildings out of the general revenues of the city and, thus, the pocketbook of each taxpayer is reached.

■ Lastly, the defendants say that the transaction has been consummated, the consideration paid and the turnover accomplished at great expense. This suit was filed on October 19, 1962, and summons served on the

437

defendants. This was before the opening of the bids on the sale of the real estate on October 22 and before the closing of the transactions on or about November 1. The suit was thus pending. The defendants were fully aware of plaintiffs' position in the matter. Moreover, section 17 of the enabling ordinance authorized the postponing of any settlement of this transaction until any litigation was "finally adjudicated or settled and all appeal rights therefrom shall have expired." Having proceeded in the face of the pending suit, the defendants acted at their peril and may not now complain if its burdens are onerous. Turney v. Shriver, 269 Ill 164, 109 NE 708.

In view of what we have said here, other points raised and discussed fade into insignificance and are not controlling. Counts I and II sought injunctive relief to restrain the municipality from proceeding to a conclusion with the sales here involved. It would be coram non judice to now restrain that which has already been accomplished. The issues made by Counts I and II are now moot. Count III seeks to vacate and set aside these transactions. It does state a cause of action. We necessarily hold that the trial court was in error in allowing the motion to strike the complaint and in dismissing the suit for want of equity and that §§ 11–76.1 and 11–76.4 of the Municipal Code alone do not complement each other to authorize the sale of a going municipal electric utility. Accordingly, the decree of the Circuit Court of McLean County is reversed and the cause remanded to that court with directions to proceed in conformity with the views herein expressed.

Reversed and remanded.

CROW, P. J. and SPIVEY, J., concur.

■

### SUPPLEMENTAL OPINION ON DENIAL OF PETITION FOR REHEARING

■ The complete misapprehension of the scope of our original opinion and the asserted catastrophic results which will flow therefrom, all as reflected by the petition for rehearing, suggest an elaboration of our views as originally expressed. It seems to us elemental that we are fenced in by the pleadings to those facts and issues properly presented to the trial court as reflected in the record together with such matters of which we can take judicial notice. The parties erected the fence. We didn't. It seems to us beyond the pale of judicial propriety or authority for us to crawl under, climb over, or peek through that fence to view and consider matters not within the enclosure.

Appellants rely solely upon 11–76.1 and 11–76.4 as the legislative origin of their authority to act. These sections in substantially the same form have been a part of our law since 1889. Session Laws 1889, p 85. Throughout their history they have used the disjunctive "or" rather than the conjunctive "and" and thus have never by precise language ever authorized a combined sale of real and personal property. This seems even more apparent in their present form where the sale of real estate is confined to one section and applies to all municipalities regardless of size, while the sale of personalty is in another section and applies only to municipalities of less than $500,000. Advertisements for bids is required in the sale of real estate, but not in the sale of personal property. Provision is made for the conversion of personal property into other material useful to the city and for its trade-in on the purchase of new equipment. The findings of the council to justify a sale of real estate is more restrictive than are those for a sale of personal property. These observations suggest that the legislature

439

was thinking of a sale of one or the other type of property, but not of a property or a going business where both are an integral part. To use these sections the council found it necessary to and did dismember the public utility and sell its separate parts.

˙ It is abundantly clear from the defendants' proposal of August 13th that it was purchasing the "entire physical properties." It was not interested in real estate as such or in personal property as such. It was interested only in both, each complementing the other as the physical structure of a going business. All parties concede that there is no specific statute either authorizing the city to accept such a proposal or authorizing any combined sale of real and personal property. There is nothing in sections 11–76.1 and 11–76.4 indicating to us that the legislature even contemplated such a sale in the adoption of these sections. We would further observe that the term "property" may denote intangibles of value such as name, "good will", etc. Where, as here, the proposal and the contracts suggest a limitation to "entire physical properties," it would seem that intangibles may not have been included and assets of value were not sold. Thus an integral part of the utility was not included.

 The power of the City of Bloomington to "acquire, construct, own and operate" a public utility is "subject to the provisions of this Division 117." Ill Rev Stats 1961, chap 24, § 11–117–1. "The words 'subject to', used in their ordinary sense mean 'subordinate to,' 'subservient to' or 'limited by.'" Englistein v. Mints, 345 Ill 48, 61, 177 NE 746, 752. The power conferred by this statute is subordinate to, subservient to, or limited by or to the express powers contained in Division 117. Nowhere is there an express power of sale. Nowhere is there an express power to terminate. Nowhere is there an express power to alienate. Indeed 117–5 forbids the discontinuance of operation by the city through lease to

440

another for longer than five years, or a renewal thereof, until sixty days after the adoption of an ordinance without a permissive referendum and if a petition is filed for a referendum, then the ordinance is effective only after its approval by a majority of those electors voting on the proposition. Division 117 is confined to and defines public utilities. Since a city may only discontinue its own operation of a utility by way of lease in this manner, it seems clear to us that the legislature did not intend that a city may discontinue its own operation of a utility by way of sale. If the power to temporarily transfer to another the authority to operate a public utility requires specific authority—and this section suggests that the legislature thought so—then surely the power to discontinue and alienate forever requires a specific legislative authority that is wholly absent.

We think Division 117 places municipal public utilities in a category by themselves. An examination of the cases cited from other jurisdictions reveals that in the same enactment, whether constitution, city charter or general statute, the power of acquisition is coupled with the power of disposition and the right to own is coupled with the right to sell, to lease, to pledge or to encumber. The right to lease, pledge or encumber a municipal public utility is specifically granted by our legislature. It seems clear to us that if there is a necessity for specific legislation on these limited subjects for a power to exist, that specific legislation is required for the power to discontinue and sell. The legislature is silent. We cannot and should not by judicial interpretation fill that void.

For these additional reasons, we adhere to our original opinion and deny the petition for rehearing.

CROW, P. J. and SPIVEY, J., concur in Supplemental Opinion on Denial of Petition for Rehearing.